BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MDL No. 2620

IN RE: WAL-MART STORES, INC., HERBAL SUPPLEMENTS MARKETING AND SALES PRACTICE LITIGATION

### PLAINTIFFS LOUISE WILLIAMS AND MARIA VALDEZ RODRIGUEZ'S RESPONSE TO MOTION TO TRANSFER

Pursuant to Rule 6.2(e) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation (the "Panel"), Plaintiffs Louise Williams and Maria Valdez Rodriguez (the "Williams Plaintiffs"), on behalf of themselves and all others similarly situated, in the action styled *Williams et al. v. Wal-Mart Stores, Inc., et al.*, No. 0:15-CV-60354, pending in the United States District Court for the Southern District of Florida, submit this response to the motion for transfer of actions filed by plaintiffs Mercedes Taketa and Michelle Fine. [D.E. 1.] There are many well-qualified jurisdictions and judges for these class action cases, but the Williams Plaintiffs respectfully request that the Panel transfer all of the Related Cases[1] to the Southern District of Florida for consolidated pretrial proceedings.

Undersigned counsel first initiated MDL proceedings for all of the Herbal Supplement GNC cases, but since February, plaintiffs across the nation have now filed more than 45 actions against four different retailers, Wal-Mart Stores, Inc. ("Wal-Mart"), Walgreen Co. ("Walgreens"), Target Corporation ("Target"), General Nutrition Corporation ("GNC"), and NBTY, Inc. ("NBTY") (collectively, the "Defendants") regarding almost identical allegations for damages resulting from herbal supplement products manufactured by similar defendants.

---

[1] "Related Cases" refers to all of the herbal supplements class actions at issue in MDL Nos. 2619 (Walgreens), 2620 (Walmart), 2621 (GNC), and 2622 (Target), and any other tag-along actions asserting similar or related claims that may be filed in or removed to the federal courts.

Undersigned counsel has filed additional class complaints for consumers against each of the four defendants in the Related Cases. It now appears that each case is premised upon the same unlawful behavior by Defendants and seek legal relief grounded in common legal theories. Thus, the Related Cases will require essentially the same discovery regarding, among other things:

(1) whether Defendants falsely, deceptively, or misleadingly misrepresented herbal supplements as containing labeled substances or containing ingredients that were not listed on product labeling;

(2) whether Defendants' misrepresentations and omissions are likely to deceive a reasonable consumer;

(3) whether Plaintiff and the putative classes were damaged by Defendants' conduct;

(4) whether Plaintiff and the putative classes are entitled to damages;

(5) whether Defendants violated various state deceptive and unfair trade practices acts;

(6) whether and to what extent Defendants have been unjustly enriched by their conduct;

(7) whether Plaintiff and the putative classes are entitled to compensatory damages, including actual and statutory damages plus interest thereon or monetary restitution;

(8) whether Defendants must disgorge any sums they have made as a result of their misconduct;

(9) whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages; and

(10) whether an injunction is appropriate to prevent Defendants from continuing to engage in unfair, deceptive, and unlawful activity.

All of the factors considered by the Panel support the transfer and consolidation of the Related Cases to a single court. Centralization of this litigation will serve the interests of justice,

judicial economy, and notions of legal comity by avoiding inconsistent pre-trial rulings and duplicative discovery. The risk of inconsistent pre-trial rulings is particularly high here, where the various plaintiffs have filed overlapping class actions.

Plaintiffs respectfully submit that the Southern District of Florida may be the most appropriate forum for transfer and centralization because (1) South Florida has a high concentration of consumers affected by Defendants' misconduct due to its large population and Defendants' strong economic relationship to the area; (2) Defendants also have strong manufacturing and distribution ties to Florida; (3) at least six class action lawsuits arising from Defendants' misconduct are already pending in the Southern District of Florida; (4) the Southern District of Florida has the resources and capacity to effectively manage this multidistrict litigation; and (5) judges in the Southern District of Florida have significant experience with MDL litigation and possess the skills necessary to effectively manage this complex litigation.

Accordingly, transfer and consolidation of this litigation in the Southern District of Florida for all of the Related Cases would promote the just and expeditious resolution of these actions.

### BACKGROUND OF THE LITIGATION

For years, some of the world's largest retailers have been deceiving the American public into buying worthless products passed off as herbal supplements. In many cases these "supplements" are devoid of the very ingredients displayed on their labels, or the retailers fail to disclose that the "supplements" contained unlisted ingredients such as rice, beans, garlic, wheat, citrus, and house plants — unlisted substances that could cause allergic reactions or unwanted side effects. As a result, health and cost conscious consumers across the nation have been walking into retail stores every day and buying bottles of "supplements" that were labeled one

way, but filled another.

Defendants are some of the largest retailers and manufacturers of herbal supplements in the world. They have systematically prioritized profits over honest labeling and consumer safety in an attempt to take advantage of the rapidly increasing number of US consumers who take herbal supplements to improve their general health and wellness. By the end of 2013, for example, more than 36 million people in the US were using herbal supplements daily. And in 2015 the United States market for herbal supplements and remedies is estimated to be $7.14 billion.

As a result of this increased consumer consumption, herbal supplements now account for approximately 30% of the global supplements market.[2] This year, the global market for herbal supplements and remedies is expected to exceed $85 billion, increasing from an estimated $80 billion in 2014. The herbal supplement market has thrived because US consumers have become increasingly aware of the importance of preventative healthcare as well as the body of science highlighting the benefits of herbal supplements and remedies without the high cost and adverse side effects that come with conventional modern medicine.

Of course, botanicals and herbals have been used for medicinal purposes for over a thousand years. These herbals are used today in the form of herbal supplements, which are made with herbs derived from various plant parts such as flowers, seeds, leaves, stems, fruits, roots or bark, and antioxidants. Gingko Biloba, Garlic, Gingseng, Echinacea, and St. John's Wort are some of the most popular herbal supplements marketed internationally. Consumers have increasingly turned to these natural supplements — derived almost exclusively from plants — for what they view as a healthier, safer, and gentler alternative to modern medicine that can

---

[2] Herbal supplements make up a significant part of the broader supplements market, which includes vitamins, minerals, meal supplements, sports nutrition, and specialty supplements.

maintain the body's nutritional content; improve digestion; sharpen memory; enhance vitality; increase lifespan; remove toxins; strengthen immunity; soothe skin; and reduce the risk of illnesses such as cancer, arthritis, ulcers, and hypertension. Many consumers turn to these supplements more than any other medicine for self-help treatment.

Recently, New York Attorney General Eric Schneiderman's office conducted an investigation that uncovered systematic misrepresentations by Defendants with respect to their labeling of the following herbal supplements:

**GNC's "Herbal Plus" brand**

- Gingko Biloba;
- St. John's Wort;
- Gingseng;
- Echinacea; and
- Saw Palmetto

**Target's "Up & Up" brand[3]**

- Gingko Biloba;
- St. John's Wort;
- Echinacea;
- Saw Palmetto; and
- Valerian Root

**Walgreens' "Finest Nutrition" brand**

- Gingko Biloba;
- St. John's Wort;
- Gingseng;
- Garlic; and
- Echinacea

**Wal-Mart's "Spring Valley" brand**

- Gingko Biloba;
- St. John's Wort;
- Gingseng;
- Garlic;

---

[3] The supplements sold by Walgreens, Wal-Mart, and Target were manufactured by NBTY, Inc.

5

- Echinacea; and
- Saw Palmetto

Schneiderman's office performed DNA testing on these supplements and uncovered the fact that four out of five of the products tested contained no trace of the herbs on their labels. And many supplements labeled as medicinal herbs contained little more than cheap fillers. From Schneiderman's February 3, 2015 press release:

> Using DNA barcoding technology to examine the contents of herbal supplements, the Attorney General's investigation is focused on what appears to be the practice of substituting contaminants and fillers in the place of authentic product. The investigation looked at six different herbal supplements sold [by Defendants . . . .] The testing revealed that all of the retailers were selling a large percentage of supplements for which modern DNA barcode technology could not detect the labeled botanical substance. While overall 21% of the product tests confirmed DNA barcode from the plant species listed on the labels, 35% of the product tests identified DBA barcodes from plant species not listed on the labels, representing contaminants and fillers. A large number of the tests did not reveal any DNA from a botanical substance of any kind. Some of the contaminants identified include rice, beans, pine, citrus, asparagus, primrose, wheat, houseplant, wild carrot, and others. In many cases, unlisted contaminants were the only plant material found in the product samples.

"This investigation makes one thing abundantly clear," said Schneiderman: "the old adage 'buyer beware' may be especially true for consumers of herbal supplements."

Defendants' misaligned priorities have landed them at the center of nationwide class action lawsuits stemming from their deceptive conduct. There are at least 45 related cases pending in at least twenty federal districts. Plaintiffs expect that many more lawsuits will be filed against Defendants in the coming weeks related to Defendants' misrepresentations, particularly because the full extent of Defendants' previously undisclosed behavior has only recently been brought to light.

**ARGUMENT**

All of the Related Cases involve overlapping putative classes and factual allegations. For the following reasons, Plaintiffs believe that these actions should be centralized for coordinated pretrial proceedings and that the Southern District of Florida is the most appropriate venue for an MDL proceeding in these matters.

## I.     Centralization is Appropriate Pursuant to 28 U.S.C. § 1407.

Centralization and transfer of these cases is appropriate pursuant to 28 U.S.C. § 1407. The purpose of multidistrict litigation is to ensure the just, efficient, and consistent conduct and adjudication of actions pending in multiple districts by providing for the centralized management of pre-trial proceedings under a single court's supervision. *See* 28 U.S.C. § 1407(a). Accordingly, courts have held that multidistrict litigation is appropriate where it "promote[s] the just and efficient conduct of 'civil actions involving one or more common questions of fact' that are pending in different districts." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1229 (9th Cir. 2006) (quoting 28 U.S.C. § 1407(a)).

Additionally, as the Panel has repeatedly recognized, when multiple, overlapping class actions are filed in different districts across the country, "centralization under Section 1407 will serve the convenience of the parties and promote the just and efficient conduct of [the] litigation" and "is necessary in order to avoid the duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." *In re Visa/MasterCard Antitrust Litig.*, 295 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003). The plaintiffs in these cases will likely seek the same discovery from Defendants related to their knowledge of the mislabeling of herbal supplements as containing substances that were not in the supplements, or containing ingredients that were not listed on product labeling. Moreover, Plaintiffs anticipate

7

that the various defendants to these actions will raise similar if not identical defenses.

Centralization of the actions is therefore appropriate, and none of the parties are unfairly prejudiced by transfer because all of the Related Cases are in the early stages of litigation. And because all of the Related Cases are at such early stages of litigation, there are no practical impediments to expedient coordination and the implementation of uniform pre-trial procedures and scheduling.

To determine whether to consolidate or coordinate proceedings, the Panel assesses whether centralization will (1) avoid the possibility of conflicting pre-trial rulings; (2) eliminate or reduce duplicative discovery; and (3) conserve the efforts and resources of the parties, their counsel, witnesses, and the judiciary. *In re Imagitas, Inc., Drivers' Privacy Prot. Act. Litig.*, 486 F. Supp. 2d 1371, 1372 (J.P.M.L. 2007). Here, each of these considerations decisively favors MDL consolidation.

1. <u>Transfer to MDL will avoid the possibility of conflicting rulings.</u>

Transfer and consolidation of the various actions will avoid the possibility of conflicting pre-trial rulings. Plaintiffs assert many of the same claims — unjust enrichment and violations of the state consumer protection statutes, for example — and inconsistent rulings could result if different courts address their claims. *See In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (noting that transfer is favored where there are overlapping legal issues among the various cases). Dispositive and other motions filed by the parties in the various cases will require the resolution of essentially the same issues of fact and law. *See In re Oil Spill by "Amoco Cadiz" off Coast of France on Mar. 16, 1978*, 471 F. Supp. 473, 478 (J.P.M.L. 1979) (ordering centralization where actions "involve common questions of fact, including questions of fault . . . ; questions of the causes and amount of damage . . . ; and questions concerning [the

8

government's] responsibility in aggravating or failing to mitigate damages"). Issues in pre-trial motions that relate to Defendants' conduct and scheme should be determined in a single proceeding in front of a single judge.

There is a significant risk of inconsistent pre-trial rulings where class actions proceed simultaneously in different jurisdictions and forums. *See In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("[it] is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest"). As this Panel has consistently recognized, centralization is appropriate where, as here, there are numerous class actions pending in different forums in order to prevent "inconsistent pretrial rulings." *Imagitas, Inc., Drivers' Privacy Prot. Act Litig.,* 486 F. Supp.2d at 1372. Thus, with numerous class actions pending in different jurisdictions before multiple judges, the risk for inconsistent pre-trial rulings is significant and substantial. Accordingly, this factor weighs in favor of the transfer and centralization of this litigation.

2.  Transfer will eliminate the likelihood of duplicative discovery.

The Related Cases are all premised on the same misrepresentations and involve essentially the same actors, facts, and legal theories. Discovery in each case will elicit documents and testimony regarding, among other things: (1) whether Defendants were aware of any mislabeling of their herbal supplements; (2) what, if any, remedial action Defendants undertook and when; (3) whether Defendants omitted or failed to disclose material facts that might affect consumers' decisions on whether to purchase herbal supplements; (4) whether Defendants misrepresented the contents of their herbal supplements; (5) whether Defendants were unjustly enriched through their deceptive conduct; and (6) whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by failing to disclose the true ingredients

9

of their herbal supplements.

Without consolidation, Plaintiffs in these cases would be required to issue, and Defendants would be required to answer, multiple and duplicative discovery requests seeking the same information, and key witnesses would be required to sit for multiple and duplicative depositions. Consolidation would promote efficiency and allow these disputes to be argued and resolved just once. *See, e.g., In re Ocean Fin. Corp. Prescreening Litig.,* 435 F. Supp. 2d 1350, 1351-52 (J.P.M.L. 2006) (holding that centralization would eliminate duplicative discovery where plaintiffs brought claims on behalf of overlapping classes). The parties will also be able to rely on the same set of expert opinions if the Related Cases are consolidated in multidistrict litigation.

Consolidation of the Related Cases will promote efficiency in the discovery process and conserve resources both for Plaintiffs and Defendants in these cases. Discovery in this litigation is likely to be complex and extensive, and consolidated proceedings will help avoid duplicitous results and repeated discovery requests. Accordingly, this factor favors consolidation because it would effectively eliminate the duplicative discovery involved in the Related Cases.

       3.    <u>Transfer will conserve the efforts and resources of the parties, their counsel, witnesses, and the judiciary.</u>

By eliminating or reducing duplicative discovery and avoiding the possibility of conflicting pre-trial rulings, consolidation will significantly reduce the efforts and expenditures of the parties' resources. Transfer preserves the parties' and the judiciary's resources because the same documents, witnesses, and physical evidence will be involved, document discovery and other written discovery would be provided once through coordinated discovery, and depositions would proceed once as to all parties instead of the numerous times that would otherwise be required if transfer were denied. In addition, the judiciary's resources are further preserved by

transfer because it would allow one Judge to preside over these matters as opposed to the numerous federal judges that would otherwise be required to adjudicate the same claims involving the same parties.

Moreover, none of the parties would be unfairly prejudiced by transfer because all of the Related Cases are in the early stages of litigation. Because these cases are so young and six are already pending in the Southern District of Florida, there are no practical impediments to transfer and the expedient coordination and implementation of uniform pre-trial procedures and scheduling will contribute toward conserving the efforts and resources of the parties, counsel, witnesses, and the judiciary.

## II. The Related Cases Should be Transferred to the Southern District of Florida.

The Panel should transfer the Related Cases to the Southern District of Florida, where six cases are already pending. Section 1407 does not specify the factors that the Panel must consider in determining the particular district in which to consolidate the litigation, but the Panel, in selecting an MDL location, has looked at the available district court's docket conditions and the district's accessibility. *See In re Veeco Instruments, Inc. Sec. Litig.*, 387 F. Supp. 2d 1365, 1366 (J.P.M.L. 2005) (selecting the Southern District of New York over the Eastern District of New York because it had more favorable caseload statistics). Here, these factors support transfer to the Southern District of Florida.

### 1. Docket Conditions in the Southern District of Florida are favorable.

The Southern District of Florida is less burdened and has significantly more favorable docket conditions than the other districts in which these actions are pending. The Panel considers the respective docket conditions of the districts where transfer is proposed. *See In re Teflon Prods. Liab. Litig.*, 416 F. Supp. 2d 1364, 1365 (J.P.M.L. 2006). The Southern District of Florida

11

has only 5,013 cases pending. (*U.S. District Courts — Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Endings March 31, 2013 and 2014, Table C*).[4] That is less than half of the 11,195 cases pending in the Northern District of Ohio and the 10,493 cases pending in the Northern District of Illinois, and less than the 9,826 cases pending in the Eastern District of Pennsylvania and the 5,507 cases pending in the Northern District of California. *Id.*

The Panel also examines "[t]he percentage of cases over three years old" on a district's docket. D. Herr, *Multidistrict Litigation Manual*: *Practice Before the Judicial Panel on Multidistrict Litigation*, § 6:17 at 210-11 (2009). Here again, the Southern District of Florida is by far the more efficient district with only 1.9% of its cases pending for three years or more. (*U.S. District Courts — Civil Cases Pending, by District and Length of Time Pending, as of September 30, 2013, Table C-6*).[5] This is particularly impressive when measured against the Northern District of Illinois, which has a rate more than five times higher (9.7%) of cases that have been pending for three years or more; the Northern District of California, which has a rate nearly three and a half times higher (6.9%); the Eastern District of Pennsylvania, which has a rate over four times higher (7.9%); and the Southern District of Ohio, which has a rate nearly three times higher (5.4%). *See id.*

Another indication of the Southern District of Florida's efficiency is that its average median time for disposition of a case (4.7 months) is four months shorter than in the Eastern District of Pennsylvania (8.7 months), over three months shorter than in the Northern District of

---

[4] *See* http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2014/tables/C00Mar14.pdf (last visited February 15, 2015); *see also* http://www.uscourts.gov/Statistics/FederalJudicialCaseloadStatistics/caseload-tatistics2014.aspx, (last viewed March 10, 2015).

[5] *See* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2013/appendices/C06Sep13.pdf, (last viewed March 10, 2015); *see also* http://www.uscourts.gov/Statistics/JudicialBusiness/2013/us-district-courts.aspx, (last viewed March 10, 2015).

California (8.1 months), nearly four months shorter than in the Northern District of Ohio (8.5 months), about five months shorter than the Southern District of Ohio and the Northern District of Illinois (9.6 and 9.7 months, respectively), and nearly eight months shorter than in the Western District of Arkansas (12.5 months). (*See U.S. District Courts — Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2014, Table C-5*).[6] The Panel has recognized that a short median time for disposition of a case is a significant factor in selecting the proper transferee court. *See In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311, 1318 (J.P.M.L. 1972) (noting the importance of median time to disposition when comparing districts).

Furthermore, the judges in the Southern District of Florida are exceptionally qualified and experienced with MDL litigation, as evidenced by the Panel's selection of the Southern District of Florida as the transferee court in numerous MDL actions. The Panel has consistently acknowledged that MDL experience is an important factor in deciding upon a transferee court. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009) (finding that centralization in the chosen district permits the Panel to "effect the section 1407 assignment to a judge who has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course"); *In re Trasylol Prods. Liab. Litig.*, 545 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) (assigning case to the Southern District of Florida and reasoning that by centralizing litigation in the Southern District of Florida, the matter would be before a district court judge with "the experience to steer this litigation on a prudent course").

---

[6] *See* http://www.uscourts.gov/uscourts/Statistics/FederalJudicialCaseloadStatistics/2014/tables/C05Mar14.pdf, (last viewed March 10, 2015).

All of the district court judges in the Southern District of Florida are exceptionally well qualified and have the necessary experience to manage this litigation. It is clear that the judges in the Southern District of Florida have the least burdened docket conditions and the extensive experience necessary to handle this complex litigation.

### 2. The Southern District of Florida has a strong nexus to the litigation.

The Panel has articulated a concern for "centrality" in selecting a district that best represents the parties involved in the litigation. *See, e.g., In re TJX Cos., Inc.,* 505 F. Supp. 2d 1379, 1380 (J.P.M.L. 2005). In determining centrality, the Panel examines geography and the economic impact of the alleged wrongful conduct. Both factors weigh in favor of the Southern District of Florida.

The Southern District of Florida is geographically a convenient and central forum for the MDL. *See In re LLRICE 601 Contamination Litig.*, 466 F. Supp. 2d 1351 (J.P.M.L. 2006) (looking to the accessibility of the forum). It is serviced by three international airports, with Miami International Airport being among the largest in the country.[7] *See In re Enfamil Lipil Marketing & Sales Practices Litig.*, 764 F. Supp. 2d at 1357 (deeming the Southern District of Florida "readily accessible"). Moreover, six of the herbal supplement class actions are already pending in the Southern District of Florida, and South Florida will likely have a high concentration of consumers affected by Defendants' misconduct due to its large population and the Defendants' expansive economic presence in the region. The collective weight of all of the factors supports the selection of the Southern District of Florida for this MDL litigation.

---

[7] Plaintiff Alex Trinidad argues for the convenience and accessibility of the Southern District of Ohio over other districts via the Cincinnati/Northern Kentucky airport. [D.E. 62.] This airport is smaller than any of the three airports located within the Southern District of Florida. *See* http://www.faa.gov/airports/planning_capacity/passenger_allcargo_stats/passenger/media/cy13-commercial-service enplanements.pdf, (last viewed March 10, 2015).

Wal-Mart, GNC, Walgreens, Target and NBTY each have a strong economic relationship to the state of Florida and, particularly, South Florida. For example, Florida is home to nearly 10% of all Walgreens stores nationwide.[8] The 853 Walgreens stores in Florida represent the highest concentration of any state.

Florida also has the second highest concentration of Wal-Mart,[9] Target,[10] GNC,[11] and Vitamin World[12] store locations of all states in the country. As stated by Elise Vazquez Warner, VP and regional general manager of Wal-Mart, "Florida is the second largest state in the country in terms of Walmart presence."[13] In addition to the high concentration of Wal-Mart stores in Florida, Ms. Warner's statement is further evidenced by the fact that two stores located within the Southern District of Florida – the Doral and Hialeah Gardens locations – are consistently among Wal-Mart's top performing stores nationwide.[14] In 2014, the Doral location was the highest grossing Wal-Mart in the United States. *Id*. In 2012, sales for the Hialeah Gardens store were the nation's highest, topping $200 million.

---

[8] *See* http://news.walgreens.com/fact-sheets/store-count-by-state.htm, (last viewed March 10, 2015).

[9] There are 343 Wal-Mart Stores in Florida. Only Texas has more Wal-Mart locations. *See* http://corporate.walmart.com/our-story/locations/united-states#/united-states/florida, (last viewed March 10, 2015).

[10] Target has 122 stores in Florida, second only to Texas' 143 stores. *See* http://pressroom.target.com/news/fastfacts, (last viewed March 10, 2015).

[11] 390 of GNC's locations are in Florida, behind California with 427 stores. *See* GNC Annual Report on the Form 10-K for the Fiscal Year Ended December 31, 2014.

[12] Vitamin World is NBTY's retail store. Approximately 10% of all Vitamin World stores nationwide are located in Florida. *See* http://www.store-locator.info/vitamin-world/store-list last viewed March 10, 2015).

[13] *See* http://www.miamiherald.com/news/business/biz-monday/article3658104.html, (last viewed March 10, 2015).

[14] *See* http://miami.cbslocal.com/2014/05/02/doral-walmart-companys-top-store-in-nation/, (last viewed March 10, 2015).

Beyond their expansive retail presence, the Defendants also have strong manufacturing and distribution ties to Florida. NBTY, which manufactures herbal supplements for Target, Walgreens and Wal-Mart, owns facilities in Boca Raton, Florida.[15] These facilities are responsible for administration, manufacturing, and distribution. *Id*. NBTY's Pompano Beach facility performs warehousing services, and its Deerfield Beach facility is responsible for packaging. *Id*. In addition, NBTY leases two manufacturing facilities in Naples, Florida. *Id*. The Florida facilities are specifically responsible for manufacturing, packaging, and labeling NBTY's customers' private label products, such as Wal-Mart's Spring Valley products.[16]

Likewise, Walgreens has two distribution centers located in Jupiter and Orlando, Florida,[17] while Wal-Mart has eight distribution centers throughout the state. In addition, one of Target's two regional sales offices in the United States is located in Fort Lauderdale, Florida[18] and it has a distribution center located in Lake City, Florida.[19]

Given the Defendants' broad economic impact within the state of Florida and specifically within South Florida, the "centrality" factor weighs strongly in favor of consolidation in the Southern District of Florida.

---

[15] *See* NBTY, Inc. Annual Report on the Form 10-K for the Fiscal Year Ended September 30, 2014.

[16] *See* http://www.fda.gov/downloads/AboutFDA/CentersOffices/ORA/ORAElectronicReadingRoom/UCM063281.pdf, (last viewed March 10, 2015).

[17] *See* http://careers.walgreens.com/career-areas/distribution/#.VP3-cI75E-0, (last viewed March 10, 2015).

[18] Target's other U.S. regional sales office is located in Texas.

[19] *See* https://corporate.target.com/careers/global-locations/distribution-center-locations (last viewed March 10, 2015).

## III. CONCLUSION

There are currently at least 45 herbal supplement class action complaints pending against Defendants. More cases will likely be filed. Plaintiffs therefore respectfully request that the Panel consolidate all of the Related Cases for discovery and pre-trial purposes under 28 U.S.C. § 1407 and transfer them to the Southern District of Florida.

Respectfully submitted this 13th day of March, 2015.

By: /s/ Adam M. Moskowitz

Adam M. Moskowitz, Esq.
Florida Bar No. 984280
amm@kttlaw.com
Monica McNulty, Esq.
Florida Bar No. 105382
mmcnulty@kttlaw.com
Robert Neary, Esq.
Florida Bar No. 81712
rn@kttlaw.com
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Telephone: (305) 372-1800
Facsimile: (305) 372-3508
*Counsel for Plaintiffs*

John Scarola, Esq.
Florida Bar No. 169440
jsx@searcylaw.com
**SEARCY DENNEY SCAROLA BARNHART & SHIPLEY PA**
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409
Telephone: (561) 686-6300
Fax: (561) 383-9451
*Counsel for Plaintiffs*

Patrick Spellacy, Esq.
Spellacy@kirwanspellacy.com
**KIRWAN, SPELLACY & DANNER, P.A.**
200 South Andrews Avenue, 8th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 463-3008
Facsimile: (954) 463-3010
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing has been filed on March 13th, 2015 via CM/ECF, with the United States Judicial Panel on Multi-District Litigation. Copies are being provided to the attorneys and clerks of the affected district courts identified on the Proof of Service List.

/s/ *Adam M. Moskowitz*
Adam M. Moskowitz, Esq.

*361031*